PUTNAM, ALDRICH & PUTNAM v. ADA HAMILTON-STODDARD-McCORMICK, J. C. DOTY, Intervener, Appellant.

Sales: BILL OF SALE: SUFFICIENCY. A written instrument reciting that the maker on a specified date sold certain personal property to the party named therein for the consideration expressed, when shown to have been executed as a part of the transaction, was admissible and proper to be considered in determining whether the sale was in fact made, though containing no words of assignment or transfer.

Same: FRAUD: RIGHTS OF SUBSEQUENT CREDITORS. A creditor cannot attack a sale of property by the debtor to a third person on the ground of fraud, where the relation of debtor and creditor did not exist at the time of the sale, without showing that the sale was made with intent to defraud future creditors, or that the seller was indebted to others than himself prior to his becoming a creditor.

Same: CREDIBILITY OF WITNESSES: EVIDENCE. Where a party testified that he had purchased certain personal property and that an instrument reciting the transaction was executed by the seller at the time, evidence that the instrument was not as old as its date indicated was competent, as bearing on the credibility of the testimony of the purchaser.

Evidence: AGE OF WRITINGS. One who has had considerable experience, or has acquired skill by making the subject a study, is competent to testify as an expert to the age of a writing; but the value of his evidence depends upon the character of the ink used, the exposure of the writing, the kind and care of the paper, and climatic influences, and in the absence of a showing of these things but little weight should be given such evidence.

Sales: DELIVERY: SUFFICIENCY OF PLEADING. Allegations of purchase, unqualified ownership, and that the pleader is entitled to the immediate possession of certain property, allege sufficient delivery to complete the purchase.

Garnishment: CLAIM BY THIRD PARTY: EVIDENCE. The evidence in this case is reviewed and held sufficient to show that intervener was not the purchaser of the property in question and in the possession of the garnishee, who answered that he had in his possession property of defendant.

*Appeal from Shenandoah Superior Court.*—HON. GEORGE H. CASTLE, Judge.

SATURDAY, APRIL 12, 1913.

THE action was commenced June 9, 1911, aided by writ of attachment by virtue of which C. C. Polly was served with notice of garnishment. He answered that he had in his possession a piano belonging to defendant. Later, J. C. Doty filed a petition of intervention, alleging that he had pur-

chased the piano of defendant November 23, 1908, and thereby became the absolute owner thereof, and prayed that the same be returned to him. The allegations of the petition were put in issue by plaintiff's answer thereto, which also averred that the sale by defendant to intervener, if made, was with the design of hindering, delaying, and defrauding creditors. Trial was had to the court and judgment entered dismissing the intervener's petition. The intervener appeals.— *Affirmed.*

*Earl R. Ferguson* and *C. R. Barnes,* for appellant.

*Denver L. Wilson* and *Thos. W. Keenan,* for appellees.

Ladd, J.—The piano in controversy was in the possession of C. C. Polly, and by virtue of a writ of attachment issued in the action of plaintiff against Ada Hamilton he was served with notice of garnishment and answered that it belonged to defendant. Thereupon J. C. Doty intervened claiming that he was owner thereof, having purchased the same of defendant. The allegations of his petition were put in issue by plaintiff and the transfer to him alleged to have been fraudulent. The issue thus raised was tried to the court. The intervener testified that he purchased the piano of his daughter, the defendant, in November, 1908, and allowed her therefor $125 of $140 she was then owing him, and that at the time a memorandum of the sale in words following was executed: "November 24, 1908, Tuesday. This is to certify that I have this date twenty-fourth (24) day of Nov. 1908 sold to Mr. J. C. Doty my piano for the sum of $125 dollars value received. Mrs. Ada Hamilton." Appellee argues that, as this contained no words of assignment or transfer, it did not constitute a bill of sale, and was not admissible in evidence. As the intervener testified that it was executed at the time as a part of the transaction, it was rightly received and considered in determining whether he purchased the piano as alleged.

1. Sales: bill of sale: sufficiency.

II.  The record does not disclose how long, if at all, the indebtedness of defendant to plaintiff accrued prior to the commencement of the action in June, 1911; nor that defendant was indebted to any one other than intervener at any other time prior thereto; nor was it alleged or proven that what she did in selling the piano was with intent to defraud future creditors. This being so, the allegations of fraud fall out of the case, for that, at the time of the alleged purchase of the piano, plaintiff was not a creditor of defendant and did not become such for a long time thereafter.

2. Same: fraud: rights of subsequent creditors.

III.  Several persons engaged in banking were permitted to testify, over objection, that in their opinion the memorandum was not written as long ago as dated.  Lake had been so engaged for fifteen years and testified that he had had experience in examining writing for the purpose of passing on handwriting and the quality of ink and instruments of that nature, and was asked if the instrument was as old as its date indicated and, over objection that this was immaterial, answered that in his opinion it was not and that he thought it less than a year old. The ruling was correct for, if the memorandum was not written as a part of the transaction, the credibility of Doty was greatly impaired.  But on cross-examination the witness admitted he could not tell definitely, that much depended on how and where the paper had been kept, and that he was unable to tell the kind of ink used.  He testified further that some ink ages more rapidly than others, but that he had discovered none that would look as fresh as this after three years

3. Same: credibility of witnesses: evidence.

IV.  Fishbaugh had been engaged in banking eight years and as a part of his duty examined instruments for the purpose of determining handwriting, signatures, age, and conditions of that character with reference to such instruments, and particularly for the last three years.  He testified that he had an idea as to the change of the memorandum in a relative way and doubted

4. Evidence: age of writings.

if the writing was a year old; that in his judgment it was not. His reasons were that the ink stood out "bright and plain," and the best ink you can buy will not do that on books. An objection was interposed that the witness' competency was not shown and that the evidence was immaterial. Similar objection was interposed to the competency of Foskett as a witness. Reed was of opinion that it was impossible to tell when the memorandum was written. There was no evidence tending to show how the memorandum had been kept or the kind of ink used. That some kinds of ink mature and fade sooner than others is matter of common knowledge.

An author says: "Nigrosine ink writing an hour old does not differ materially in any way from writing with the same ink one, two or three years old. Nigrosine inks are not all of the same quality and therefore may differ somewhat from each other in appearance, but the ink does not change on the paper to a sufficient extent to warrant any opinion as to its age unless it be very old." Osborn on Questioned Documents, 350. Again: "In most cases it is a dangerous undertaking for any one to make an examination of an ink and venture to say just how old it is unless it is very recent or very old, but by recording the color as first seen, any observer with good eyesight can answer the question whether the ink is still undergoing a change in color . . . The time required for fresh iron-nutgall ink of good quality to reach a neutral black is from about fourteen to twenty-four months," and the author proceeds to discuss the value of the color test in determining the age of ink.

Mr. Ames, in his work on Forgery (page 265), says: "To determine the exact age of writings by the ink used is impossible. The approximate age may be determined with some degree of certainty. If ink writings are but a few days old, it is easy to distinguish them from other writings years old. But to tell by the ink which of two writings is the older, when one is but two months and the other two years, is, as a rule, impossible." And he lays much stress on chemical

tests. From these excerpts it would seem that testimony as to the age of writing when within a few years is not very reliable.

In *Williams v. Clark*, 47 Minn. 53 (49 N. W. 398), referring to testimony that notes purported to be executed years before had been recently signed, the court said: "These opinions were based only upon the presence of the notes when the witness saw them, without any knowledge as to the prior appearance or character of the paper or the ink or as to the place where or conditions under which they have been kept." And it was intimated that the evidence was not admissible though held not to have been relevant.

In *Ellingwood v. Bragg*, 52 N. H. 488, the witness was held incompetent, though having had considerable experience in comparing handwriting, for that he had made no special study of the particular question.

In *Clark v. Bruce*, 12 Hun (N. Y.) 271, an attorney testified that he had had occasion to examine old and new writings when they were claimed not to be genuine and that he had examined the indorsement on the notes in controversy. He was then asked in substance whether in his opinion the indorsements were written at a more recent date than there dated. It was objected that the witness had not shown himself competent, and the court said:

He was not asked to state facts, to describe the appearance of the indorsements in any respect, but to give an opinion as to the time when the indorsements were made, based upon the appearance of the writing and the ink. What was the appearance of the writing and the ink does not appear by the evidence. We do not think the witness had shown himself to be an expert on that subject. To judge of the genuineness of handwriting—that is, to judge whether it was written by the person whose handwriting it purports to be— is one thing; to determine its age from its appearance is quite another. The witness may have had occasion to pass upon the genuineness of many writings, old and new, and yet never have been called on to form an opinion, from the

appearance of handwriting, as to whether or not it was written at the time it bore date. In the present case, there was no question as to the genuineness of the indorsements. It was undisputed that they were written by Clark, the plaintiff's husband. The only question was whether they were written at the times they bore date respectively, and upon that point it was proposed to give the opinion of a witness who was not shown to have any experience upon the subject, an opinion based upon appearances which are not described in the evidence, and which he was not asked to state. We think the objection was properly sustained.

In *Cheney v. Dunlap,* 20 Neb. 265 (29 N. W. 925, 57 Am. Rep. 828), the court, though apparently holding the age of writing not to be a subject of expert opinion, really decided evidence of this kind not enough to sustain a judgment for it, speaking through Cobb, J., said:

I do not think that any amount of science, study, or skill would enable a person, by mere inspection, to judge or testify of the age of handwriting with that accuracy necessary to its value or safety in judicial proceedings. The appearance of a written paper some years, or even months, will depend greatly upon the color, kind, and quality of the ink used, and greatly upon the receptacle or place where the paper has been kept, whether excluded from the air or sunshine, whether in a dry or damp, hot or cool place, and other conditions, the knowledge of which must be derived from sources other than inspection. Again, there is no recognized science or trade in which it can be said to be necessary that persons engaged in it should be skilled in detecting the age of writings by inspection. The science of the law perhaps comes nearer to it than any other, and the instances in which it becomes necessary, or even useful, that the legal practitioner should possess such skill, are very rare. I am therefore of the opinion that, whether the depositions were admissible or not, they do not contain sufficient evidence to sustain the finding and judgment of the trial court.

This court is committed to the doctrine that the matter may be the subject of testimony. In *Eisfield Co. v. Dill,* 71

Iowa, 442, the question was whether a certain instrument had been written thirty years previous or recently, and the county auditor, a teacher of penmanship of long experience, and an attorney of long practice testified that they were familiar with old papers and writings and thought they were capable of giving an opinion on the question. Concerning the objection to the competency of the witness, the court said that it was "not necessary to qualify a witness to testify upon the question, that he should be a chemist and have knowledge of the chemical composition of ink" and that the subject was proper for expert testimony and held the witness competent. It will be observed, however, that the inquiry was whether the instrument had been written thirty years previous or shortly before the trial, and, while the witnesses might have been able from their qualifications to give an opinion on this issue, they might not have been able to respond to the inquiries in the case at bar. Nothing was said as to the doubtful value of the opinions expressed. Ordinarily, men give little or no attention to such matters as the age of writings or instruments or the influence on ink of time and exposure, and necessarily the opinions of those who do make a study of these or necessarily in the course of business investigate the same may speak with greater authority. Undoubtedly, something can be ascertained generally from an inspection by those laying no claim to skill or experience; but we are of opinion that, if a witness has qualified by showing some considerable experience in determining the age of writing or has made the subject such a study as that he has acquired considerable skill in ascertaining the age of writing, he should be allowed to testify on that subject as an expert. The value of his opinion when expressed necessarily depends on the character of the ink used, to what extent exposed, the kind and care of the paper, where and how kept, climatic influences, and the like. The evidence was admissible, but, as no showing was made of how the memorandum had been kept nor of the kind of ink used, was entitled to little if any weight.

V. Appellee urges that delivery to intervener was neither alleged nor proven. His petition asserted that he had purchased the property, was the unqualified owner thereof, and entitled to immediate possession. If so, there must have been a delivery to complete his purchase. Though actual delivery may not have been effected at the time of the transaction, the evidence indicated that intervener may have been in possession long prior to the commencement of the action.

5. SALES: delivery: sufficiency of pleading.

He testified that in the spring of 1908 he came from Montana, where he had been living, to Omaha, Neb., where he roomed at the boarding house operated by his daughter; that shortly afterward she failed, and he rented another house; that she and her child boarded with him until November of the same year at the agreed price of $20 per month; that about that time she and a Mrs. Hathaway started another boarding house and the piano was taken from his home there; that he with his wife began boarding with her, but insisted upon crediting her on what she was owing him instead of paying in cash; that she was pressed for means with which to pay rent, for coal, and the like, whereupon they agreed that he should allow her $125 for the piano on the $140 due him for boarding herself and daughter and that he would pay cash for his board, which he did; that he boarded with her until February, 1909, when she closed her boarding house; that he then rented rooms, and, after working awhile, she kept same for him, his wife having gone to assist another daughter, and the piano and defendant's goods were brought to the rooms; that they moved to Shenandoah in the early summer of 1910 into a house with all their goods including a piano; that later, on closing their house, the piano with other goods were stored by his wife with Polly. The witness was not directly contradicted, but he admitted that he had never charged his daughter for board prior thereto or since, and it appeared that during the same summer $400 had been paid the daugh-

6. GARNISHMENT: claim by third party: evidence.

ter as alimony upon being divorced from her husband. According to his testimony, nothing had been expended by her in furnishing the boarding house, and immediately upon the failure of her enterprise she was received in his home without thought of requiring her to compensate for her keeping. Never, save in creating the alleged debt, furnishing the alleged consideration, the piano, had she ever been charged for board by her father. Moreover, the recent receipt of the alimony tends to contradict the latter's testimony that she was without means to supply food and fuel for the boarding house. Added to this is the doubt as to whether the memorandum of sale was not prepared for the purposes of trial.

The record was such that the court might have concluded the story told by the witness unworthy of belief, and, as its decision must be accorded the effect given a finding by a jury, we cannot interfere, and the judgment must be and is *Affirmed*.